**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD DROWN, | Civil Action No.: 08-02226 (PGS) |
| Plaintiff, | |
| v. | **OPINION** |
| MICHAEL FAILLACE, ESQ., et al., | |
| Defendants. | |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), filed by defendant Michael Faillace, Esq. and Michael Faillace & Associates, P.C. (collectively "Faillace"), seeking to dismiss the legal malpractice claims brought against them by plaintiff Richard Drown.  Drown alleges that Faillace committed legal malpractice by failing to know and advise him of the correct statute of limitations for a potential claim under the New Jersey Law Against Discrimination (hereinafter the "NJLAD"), N.J.S.A. 10:5-4.1 et seq.; thereby causing Drown to be out of time to prosecute a claim against his former employer.

## I.     BACKGROUND

On or about August 13, 2003, Charles Schwab Capital Markets (hereinafter "Schwab") in Jersey City, New Jersey, extended an offer of employment to Drown for the position of Senior Staff Technology Services/EPT Production Support.  Drown had been referred to this position by a former

colleague, Rich Steiner, with whom Drown had worked in a prior position at Goldman Sachs/SLK Capital Markets.  He was to be on-site in the Jersey City office of Schwab to ensure that the computer systems and programming facilitated uninterrupted electronic trading.  He states that Schwab created this position for him; Faillace agrees that Schwab needed help setting up the program trading desk but does not expressly state that the position was created for Drown.

When he applied for the position, Drown signed an employment application, which stated that "Charles Schwab operates 24 hours a day, seven days per week; and weekend work, overtime (if applicable to me) and changes of schedule and geographic location may be required during my employment."  Drown's offer of employment letter set his annual salary at $150,000 and noted that he would receive a $10,000 signing bonus upon his completion of thirty calendar days as an employee.  It also stated that he was eligible to receive a target bonus of twenty-five percent of his annual salary.

Drown began working for Schwab on or about September 2, 2003, and was located at the electronic trading desk in Jersey City, New Jersey, while the rest of the IT team and his manager, Sanath Fernando, were located in San Francisco, California.  Drown explained that his work environment, like any surrounding an IT person who supports program traders, was full of energy and commotion:

>  [A]t the end of the day, their [(traders)] compensation is based on their P and L, you know.  For market makers, they have a constant flow so, you know, they make their money as the day goes by.  For program traders it's much worse because the funds tend to send their order right before the close and they will send it like 15 minutes before the close, so during those 10 minutes everything has to be perfect, you know, so yes, people get extremely angry and, you know, they say, oh, this, you know, swearing system again, blah, blah, blah. People will break things.  I've seen my [former] boss at Knight break a screen threatening one of my co-workers, but it's part of the drama,

> and as soon as it closes, the markets over, you know, for example,
> two traders that were arguing about something and looked like they
> were going to fight, then it's okay so are you going for a drink, yeah,
> we'll go for a drink, so, yes, it goes to extremes.
>
> [Ex. A. Pl.'s Dep: T77:8-78:1.]

Drown also described his position as "fire fighting" – dealing with emergent, time sensitive matters.

Drown contends that his ability to accomplish tasks as a programmer was complicated because the main trading system for Schwab and the FIX subsystem that was used to send and receive orders from different institutions were housed in Jersey City, but the program trading engines – the main program trading software function – were in San Francisco.  His ability to support the trading desk was further complicated because Drown would not learn of upgrades to the main trading system until the system was non-responsive because the "black box" group was secretive.

Drown maintains that although serving as the local technology representative and programmer in Jersey City was his top priority, Fernando wanted him to engage in the non-programming task of data collection, which was not only very time consuming, but also a non-programming task in which he did not have experience.  He states that such data collection was generally performed by auditors and that Fernando was not aware of the difficulty of obtaining such data.  Drown explains that it was difficult to obtain the requested data because it was not clear where such data was maintained or the form in which it was maintained.  He was only advised which group "owned" the data, and competition among the groups prevented access to information about the internals of their systems and how calculations were done.  Drown asserts that he was sent on a "wild goose chase" because he was asked to collect perfect data, which did not exist.  The time he spent chasing people around to get data files detracted from his ability to develop an understanding of EPT

3

systems and data.  He states that he had to prioritize his tasks and make the daily trading his top priority so that customers would be satisfied and would not take their business to a competitor.

At some point before March 2004, Drown had the impression that Fernando was dissatisfied with his performance.  He realized that his performance was impaired and that he had to work longer hours to correct it.  He also found that it took him longer than normal to complete tasks; therefore, around March or April 2004, Drown consulted Doctor Sue Nadesan, a general internist, to discuss complaints of fatigue and difficulty concentrating.

On April 6, 2004, as a result of consulting Dr. Nadesan, Drown advised Human Resources at Schwab, via e-mail, that he began taking Synthroid for a thyroid condition called Hashimoto's disease.  Dr. Nadesan's office notes from April 26, 2004, reflected that Drown expressed that he was under a lot of stress and that "he [did] not like his job." On May 3, 2004, the Human Resources Director, Elizabeth DeMovic, sent Dr. Nadesan a letter requesting confirmation as to whether Drown required a reasonable accommodation and whether Drown would have any limitations in completing his work responsibilities.  Initially, there was no response from Dr. Nadesan.  Drown and DeMovic corresponded via e-mail regarding Dr. Nadesan's lack of response.  Drown was responsive to DeMovic's e-mails and attempted to contact Dr. Nadesan to ask her to provide the requested information to Schwab.

On June 22, 2004, DeMovic sent a follow-up letter to Dr. Nadesan and included Drown's signed Authorization for Release of Medical Information Form.  On or about July 26, 2004, Dr. Nadesan completed the Certification of Need for Reasonable Accommodation.  That Certification asked: "Does your patient have a physical or mental impairment that substantially limits one or more of his/her major life functions, such as caring for himself/herself, performing manual tasks, walking,

4

seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reading?" Dr. Nadesan responded "No," and did not list that Drown had any limitation as a result of his thyroid condition.  However, Dr. Nadesan wrote that "stress situations make him concentrate poorly and work slowly.  Should improve once thyroid function levels normalize."  Further, in response to the question, "would any job modification or accommodation enable your patient to perform the essential functions of his/her job," Dr. Nadesan checked "yes" and wrote "less stress."  Dr. Nadesan wrote that such accommodation should last six months.  DeMovic stated at her deposition that she had never seen an accommodation request of "less stress" in her experience and that such an accommodation would be hard to measure.

Drown explained during his deposition, that sixty percent of his time was generally spent on analysis and forty percent was spent on programming trading.  Drown averred that it would have reduced his stress during that time to have the analysis portion of his position temporarily assigned to another employee.  Drown contends in his Counter-Statement of Material Facts that  Schwab could have temporarily taken away the non-essential task of data collection and data analysis, so that Drown could focus on supporting the trading desk.  He maintains that he was not seeking as an accommodation, any change in the stress inherent in the job that he was experienced in and hired to perform at Schwab (i.e. the "firefighting" needed to support the trading desk).  However, Faillace contends otherwise, saying that Drown essentially admitted that he would have to be paired with someone else to make his job easier.

On July 29, 2004, Drown, DeMovic, and Fernando held a teleconference to discuss Drown's work performance.  The group discussed a Performance Memo, dated July 26, 2004, in which Drown was given a "written warning" for several job performance problems.  The Memo stated:

Your work performance does not meet expectations and has been such as of your hire date of September 2003. . . .

On numerous occasions, beginning in November 2003, I have discussed your performance shortcomings with you, including a formal conversation on this topic that took place on Friday[,] February 6th and Monday[,] February 9th 2004. As of that conversation, your performance has deteriorated further leading to a "Corrective Action" rating for the recently concluded annual review period that ended in June 2004.

It is imperative that you make the necessary improvements immediately and sustain these improvements going forward.

The Memo also listed the following "Areas of Improvement":

- Understanding of EPT Systems (Matador/CRAM): Drown was unable to complete a project within 6 months that was reassigned and completed by someone else within one day;

- System Automation;

- Managing EPT Electronic Connections: Drown failed to assist in connecting new clients and his contribution towards daily operational duties were minimal;

- Daily Status Reports: Drown failed to provide such mandatory reports;

- Unexcused Absence: Drown took a two week vacation without notice or approval and was otherwise late to work or altogether absent without providing notice, thereby placing "the group at risk";

- Working with San Francisco Staff: Drown failed to maintain phone contact with the San Francisco team despite requests for daily end of day calls;

- Travel & Entertainment Expenses: Drown would use his personal card as opposed to the corporate credit card; and

- Accuracy and Dependability of Your Work.

Finally, the memo outlined the actions that Drown would need to take going forward.  Drown disputes the accuracy of the criticisms in the Performance Memo.

During his deposition, Drown explained that he did not provide the daily status reports because "when you get to work at seven, 7:30, you spend all day running around and sometimes fire fighting, you know you always think, well, I'll do it tomorrow, and then as soon as you get in, something else."  Drown also stated that he "just knew they weren't happy," and that he did not think that he was performing well.

Following the Performance Memo, Drown was absent from work on July 30, 2004, and August 2, 2004.  In both instances, he e-mailed his manager in San Francisco, half-an-hour after the start of his 7:00 a.m. work day.  On August 5, 2004, Drown was terminated.  The Recommendation for Company Initiated Termination stated, "As a result of Richard's continued overall unsatisfactory performance and his inability to follow the procedures for reporting time-off, he is being terminated for unsatisfactory performance and attendance."

The parties  in this case discuss Drown's subsequent work history, however, this Court does not believe that those facts are material to deciding the instant motion; thus, this Court will not discuss those facts.

Subsequent to his termination, in August of 2005, Drown began pursuing a law suit against his former employer, Schwab.  On December 16, 2005, Drown consulted attorney Alan Berlowitz, Esq.  Berlowitz referred Drown to Michael Faillace to discuss Drown's former employment with Schwab.  Drown met with Faillace and Faillace's Clerk, Kelvin Yu, on December 21, 2005.

7

Drown and Faillace had an "open discussion" about the underlying facts of Drown's employment and termination at Schwab.  The discussion was "without detail," but Drown gave Faillace a "gross idea of the chain of events so that Faillace could see the strengths and weakness of Drown's case.  Drown has indicated that the NJLAD and the Family Medical Leave Act may have been discussed at that meeting.

In addition, Drown and Faillace discussed Drown's possible retention of Faillace.  However, Drown did not retain Faillace that day; he explained that it was because he had to think about and understand the retainer agreements. Consequently, the next day, on December 22, 2005, two retainer agreements were forwarded to Drown.  Thereafter, Faillace's office sent Drown cover letters and invoices regarding the payment of the $400 initial consultation fee on (1) February 10, 2006, (2) July 1, 2006, and (3) August 1, 2006.  Drown paid the initial consultation fee on August 11, 2006, almost eight months after the initial consultation.  By that time, the two year statute of limitation on Drown's potential claim under the NJLAD had run.  Drown contends that he was not aware that the statute of limitation had run when he paid the initial consultation fee.

During the time between the initial consultation and when Drown paid for the initial consultation, Drown does not recall having communications or contact with Faillace but does believe that he had telephone communications with Yu.  Yu has stated that Drown requested more specific information on the estimated fees and costs involved in a partially hour retainer.  Drown says he needed more information about the projected fees to determine which retainer proposal to choose.

 In November 2006, Drown went to Faillace's office to pursue his case.  Drown states that he had decided to engage Faillace using the hybrid retainer agreement.  Drown also maintains that at this meeting, Faillace called another attorney and learned that  the applicable statute of limitation was two

years and that the time for filing a claim under the NJLAD had already passed.  Drown has stated that it was his belief in December 2005, that he had three years to bring suit against Schwab.  He thought it was three years because prior to his meeting with Faillace in December 2005, Drown did not know what the statute of limitations was.  Nevertheless, he did not expressly ask Faillace how long he had to bring suit.

On May 8, 2008, Drown, a Pennsylvania resident, filed a legal malpractice suit against Faillace and his law firm in this Court, asserting that Faillace failed to advise Drown of the two year statute of limitation to file a NJLAD claim against Schwab.

## II.    SUMMARY JUDGMENT STANDARD

The motion before this Court is for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  *Jersey Cent. Power & Light Co. v. Lacey*

*Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").  Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement. *Anderson*, 477 U.S. at 247-48.  If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007).

## III.   DISCUSSION

Attorneys in New Jersey are obligated to exercise a degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise.  *See St. Pius X House of Retreats v. Diocese of Camden*, 88 N.J. 571, 588 (1982).  The New Jersey Supreme Court has stated that a plaintiff in a legal malpractice suit must show: "(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." *Jerista v. Murray*, 185 N.J. 175, 190-91 (N.J. 2005) (quoting *McGrogan v. Till*, 167 N.J. 414, 425 (N.J. 2001)).  "In legal malpractice cases, as in other cases, summary disposition is appropriate only when there is no genuine dispute of material fact." *Ziegelheim v. Apollo*, 128 N.J. 250, 262 (N.J. 1992) (citation omitted).

Faillace asserts that Drown cannot establish a legal malpractice claim because he cannot satisfy the first or third prong of a prima facie case for legal malpractice.  As to the first prong, Faillace argues that an attorney-client relationship was never established. As to the third prong, Faillace argues that Drown cannot show proximate cause because (1) Drown's underlying NJLAD claim would have failed as a matter of law and (2) Drown's expert should be barred as a net opinion.

A.    The Existence of an Attorney-Client Relationship

The threshold inquiry in a legal malpractice claim is whether an attorney-client relationship has been established.  *See Jerista*, 185 N.J. at 190-91.

Faillace argues that § 26 of the Restatement of the Law Governing Lawyers (1996), which in 2000 was relocated to § 14 of the Restatement of the Law Governing Lawyers, sets forth that an attorney-client relationship is created when:

> 1) a person manifests to a lawyer the person's intent that the lawyer provide legal services to the person; and either
>
> > (a) the lawyer manifests to the person consent to do so; or
> >
> > (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relied on the lawyer to provide the services.

*See Dixon Ticonderoga Co. v. Estate of William F. O'Connor,* 248 F.3d 151, 169 (3d Cir. 2001) (quoting Restatement of the Law Governing Lawyers § 26 (1996) and citing *Herbert v. Haytaian*, 292 N.J. Super. 426, 436-37 (N.J. App. Div. 1996)).  Faillace argues that none of those conditions are present to establish the existence of an attorney-client relationship.  First, Faillace asserts that Drown never manifested an intent to have him represent Drown's employment claim against Schwab because (1) Drown did not execute either of the two retainer forms provided to him; (2) he did not

11

communicate or contact Faillace for eight months; (3) he reached out to Faillace after the initial

consultation to inquire about the financial aspects of retaining Faillace, but did not discuss his claim;

and (4) Drown had communicated that he had contacts with other attorneys.  Second, Faillace

maintains that he had no basis to reasonably believe that Drown was relying on him because of

Drown's silence for eight months and failure to execute a retainer.  Nevertheless, Faillace also

concedes that the Supreme Court of New Jersey has expanded the scope of the attorney-client

relationship in special circumstances, explaining that "attorneys may owe a duty of care to non-

clients when the attorneys know, or should know, that non-clients will rely on the attorneys'

representations and the non-clients are not too remote from the attorneys to be entitled to protection."

*Petrillo v. Bachenberg*, 139 N.J. 472, 483-84 (1995).  Faillace argues, however, that the special

circumstances addressed in *Petrillo* are not present in this case.

        In response, Drown argues that the absence of a retainer does not preclude the formation of

an implied attorney-client relationship.  Drown argues that the Appellate Division of the New Jersey

Superior Court has stated that an implied attorney-client relationship can exist when

> (1)      a person seeks advice or assistance from an attorney,
>
> (2)      the advice or assistance sought pertains to matters
>          within the attorney's professional competence, and
>
> (3)      the attorney expressly or impliedly agrees to give or actually
>          gives the desired advice or assistance. . . . Such a relationship
>          may be established through preliminary consultations, even
>          though the attorney is never formally retained and the client
>          pays no fee.

*Herbert*, 292 N.J. Super. at 436 (quoting *Bays v. Theran*, 418 Mass. 685, 639 N.E.2d 720, 723-24

(1994))**.**

Drown maintains that an implied attorney-client relationship was formed because (1) Drown sought advice from Faillace related to his potential employment claim against Schwab, (2) about a matter within Faillace's professional competence, and (3) Faillace advised Drown that the statute of limitations for his claim was three years.  Drown further asserts that even in the absence of an attorney-client relationship, a lawyer is expected to know and state settled law accurately.  *Procanik v. Cillo*, 226 N.J. Super. 132, 149-50 (N.J. App. Div. 1988).  Drown argues that Faillace knew or should have known that Drown would  depend on the accuracy of the advice given as to the statute of limitations for the claim.

Having considered the law and arguments presented by the parties, this Court concludes that there is a genuine issue of material fact as to whether an attorney-client relationship was formed pursuant to § 14(1)(b) of the Restatement of the Law Governing Lawyers.

To establish an attorney-client relationship under § 14(1)(b), the first inquiry is whether Drown manifested an intent to have Faillace provide legal services.  Drown arguably manifested an intent to have Faillace provide legal services when he went to Faillace's office on December 21, 2005, and inquired about what claims he may have against Schwab.  However, Drown never signed a retainer.  In light of those conflicting facts, this Court cannot say that there is no genuine dispute as to whether Drown manifested intent to have Faillace provide him with legal services.  *See Dixon Ticonderoga Co.*, 248 F.3d at 169 (finding a genuine issue of material fact as to § 14(1) where outside counsel conversed with attorney about possibility of suing prior attorney for malpractice and attorney did not affirmatively refuse representation).

The next  inquiry is whether Drown reasonably relied on Faillace to provide such services and whether Faillace knew or should have known that Drown was doing so.  Faillace maintains that

there was no reasonable basis on which he knew or should have known that Drown was relying on him because Drown did not contact Faillace for eight months and failed to execute a retainer. However, Drown asserts that it is established precedent that a lawyer that decides to state settled law "to a client or a prospective client . . . . is expected to know what it is and to state it accurately." *Procancik*, 226 N.J. Super. at 149-50.  Faillace counters that Drown has not shown Faillace stated the law inaccurately because Drown was uncertain whether Faillace told him that the statute of limitations under the NJLAD was three years.  However, Drown's deposition reveals that it was his belief in December 2005, that he had three years to bring suit against Schwab.  Further, when questioned why he thought it was three years, he responded "Because Michael [Faillace] must have mentioned that there was a statute of limitations, and I don't know where else I could have had that idea from besides our initial discussion."  If Faillace stated that the applicable statute of limitation was three years, then Faillace should have known that Drown would have relied on that information. This is a close issue, but there is an ambiguity as to whether Faillace discussed the applicable statute of limitations with Drown and if so, whether he misstated settled law as to the applicable statute of limitations.  Because this is a motion for summary judgment, ambiguities must be resolved in favor of the non-moving party.

Because this Court has concluded that there is a genuine dispute as to whether an attorney-client relationship was formed under § 14(1)(b); this Court  need not address whether § 14(1)(a) of the Restatement of Law Governing Lawyers is satisfied, whether an implied attorney-client relationship was formed, or whether Faillace could be held liable for allegedly misstating the applicable statute of limitations in the absence of an attorney-client relationship.

**B.      Breach of the Duty of Care by Faillace**

The next inquiry in establishing a legal malpractice claim is whether Drown can establish that Faillace breached the duty of care owed to him.  However, Faillace does not appear to dispute Drown's legal malpractice claim on this basis; therefore, this Court will move on to consider the final inquiry in the establishment of a legal malpractice claim – proximate cause.

**C.      Proximate Cause**

"The plaintiff-client has the burden of proving, by a preponderance of competent credible evidence, that injuries were suffered as a proximate consequence of the attorney's breach of duty. A plaintiff-client must present more than mere conjecture, surmise or suspicion to satisfy his or her burden of proof." *Pollen v. Comer*, No. 05-1656, 2007 U.S. Dist. LEXIS 46906, *21 (D.N.J. June 28, 2007) (internal quotation marks and citations omitted).  In this case, establishing proximate cause would require Drown to demonstrate that he would have prevailed in his underlying employment discrimination claim under the NJLAD.  Faillace attacks Drown's ability to establish proximate cause on two grounds: (1) that Drown cannot establish as a matter of law that he would have prevailed in his claim under the NJLAD and (2) Drown's expert opinion qualifies as a net opinion. Those arguments will be addressed in turn.

**1.      Would Drown have been able to prevail under the NJLAD?**

Most employment discrimination claims proceed in accordance with the three-step *McDonnell Douglas* burden-shifting paradigm.  *Victor v. New Jersey*, No. A-2, 2010 N.J. LEXIS 834, *47 (N.J. Sept. 13, 2010)*. The *McDonnell Douglas* burden-shifting paradigm requires that the plaintiff bear the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 801-04 (1973).   Once a prima facie case has been

established, the *McDonnell Douglas* analysis shifts the burden of articulating a "legitimate, non-discriminatory reason for the adverse employment action" to the employer.  *Stouch v. Twp. of Irvington*, 354 Fed. Appx 660, 666 (3d Cir. 2009) (citing *McDonnell Douglas*, 411 U.S. at 802-05); *see also Victor*, 2010 N.J. LEXIS 834, at *47 n. 9.  "The employer satisfies this burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  If the defendant-employer is able to articulate a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff-employee to establish that the proffered reason is a pretext for discrimination.

Faillace asserts that (1) Drown cannot establish a prima facie case under the NJLAD because he does not qualify as disabled and (2) he cannot show a discriminatory pretext.

(a)     Can Drown Establish a Prima Facie Case?

Recently, the Supreme Court of New Jersey reaffirmed that the plaintiff bears the burden of establishing a prima facie case of employment discrimination under the NJLAD. *Victor,* 2010 N.J. LEXIS 834, at *47.  However, the Court cautioned that "[t]here is no single prima facie case that applies to all employment discrimination claims"; rather, the elements vary based on the particular cause of action. *Id.* at *48.  The Supreme Court of New Jersey explained that a prima facie case for reasonable accommodation requires a "plaintiff to prove [(1)] that he or she was disabled, [(2)] that he or she performed or could have performed the job with or without an accommodation, and [(3)] that there was an adverse consequence." *Id.* at 53-54.  Additionally, the Court stated that the second prong of the prima facie case "would entail proof of either failure to accommodate or failure to engage in the interactive process." *Id.* at 54.

16

That standard appears to differ from the standard set forth by the Court of Appeals for the Third Circuit, which has stated that to prevail on a NJLAD claim for failure to accommodate, a plaintiff must establish: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006); *see also Moussavian v. China Ocean Shipping Co. Ams. Inc.*, No. 06-4818, 2009 U.S. Dist. LEXIS 86721, *13 (D.N.J. Sept. 21, 2009); *Peacock v. Albertsons Acme Mkts.*, 607 F. Supp. 2d 694, 700 (D.N.J. 2009).

Both of those standards, vary from that asserted by Faillace – that Drown would have to demonstrate "(1) [he] has a disability; (2) [he] is otherwise qualified to perform the essential functions of the job, with or without the accommodation by the employer; and (3) [he] suffered an adverse employment action because of [his] disability." This Court need not make a finding as to which standard applies in this instance, because Faillace's argument focuses on whether Drown's thyroid problem was a qualifying disability under the NJLAD – a prerequisite noted in all three standards. Therefore, for purposes of this motion, this Court will confine its discussion on the first prong of a prima facie case to whether could have qualified as disabled under the NJLAD.

Faillace maintains that Drown cannot be deemed disabled because Dr. Nadesan stated that Drown suffered no limitations due to his thyroid problem. However, unlike under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq., the term "handicapped" in the NJLAD is "not restricted to 'severe' or 'immutable' disabilities and has been interpreted as significantly broader than the analogous provisions of the [ADA]." *Viscik v. Fowler*, 173 N.J. 1, 15 (N.J. 2002) (citation omitted). A plaintiff claiming a non-physical disability under the NJLAD must prove he

"is suffering (1) from any mental psychological or developmental disability (2) resulting from an anatomical, psychological, physiological or neurological condition that either (a) prevents the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." *Id.* at 16 (citations omitted). Drown's thyroid condition likely falls within that definition because his ability to concentrate, a mental ability, and his ability to work efficiently were impaired by his abnormal thyroid function.

In Faillace's reply brief to this Court, Faillace also argues that "Drown would not have been able to establish that his ability to perform the essential functions of the job would be undisturbed," and that "prior to a discussion as to whether the requested accommodation was 'reasonable' . . . Drown must initially establish that he could perform the 'essential' functions of his job." This Court agrees that in order for Drown to establish a prima facie case Drown would have to show that he was able to perform the essential functions of the job and also agrees that such a consideration should be made prior to a determination of whether the requested accommodation was reasonable. However, Faillace never directly argues in his initial motion that Drown could not establish that he was able to perform the essential functions of his job. Rather, Faillace's moving papers conflates its discussion of Drown's requested accommodation of "less stress" with its discussion of whether Drown could establish that Schwab had a discriminatory pretext. To illustrate, Faillace maintains: "Consequently, if Drown had pursued a claim against Schwab, once Schwab presented its evidence concerning Drown's questionable performance, Drown would have to show a discriminatory pretext – particularly a failure to provide him a reasonable accommodation." Therefore, this Court interprets Faillace's reasonable accommodation argument as going to whether Drown could sustain his burden on the third stage of the *McDonnell Douglas* burden-shifting paradigm and not to whether

Drown could establish a prima facie case under the first stage of the *McDonnell Douglas* burden-shifting paradigm.

In light of that finding, this Court further determines that Faillace did not dispute Drown's ability to establish that he could have performed the essential functions of his job in the initial motion. Rather, that issue was raised for the first time in reply. Courts in this district have stated that "[t]he purpose of the reply brief is to respond to the opposition brief or explain a position that the respondent has refuted." *Dana Transport v. Ableco Finance*, 2005 U.S. Dist. LEXIS 18086 (D.N.J. Aug. 17, 2005) (stating "argument raised for the first time in defendant's reply brief will be disregarded"); *see also Merling v. Horizon BCBS*, 2009 U.S. Dist. LEXIS 67120 (D.N.J. July 31, 2009) (explaining "parties may not use the reply to raise a new issue"). Therefore, because Faillace raises whether Drown could establish that he was qualified to perform the essential functions of his position for the first time in reply, this Court will not consider the arguments in the reply brief that pertain to that narrow issue.

Accordingly, this Court will now turn to consider whether Drown can sustain his burden of demonstrating a discriminatory pretext for his termination.

(b)     Can Drown Show a Discriminatory Pretext?

Under the *McDonnell Douglas* burden-shifting paradigm, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a "legitimate, non-discriminatory reason for the adverse employment action." *Stouch*, 354 Fed. App'x at 666. If the defendant-employer is able to articulate a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff-employee to establish that the proffered reason is a pretext for discrimination. The plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could

19

reasonably either: (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.  "A plaintiff will survive summary judgment if she can produce evidence sufficient 'to meaningfully throw into question' the employer's reason for the allegedly discriminatory action." *Reich*, 2009 U.S. Dist. LEXIS 90540, at *29 (quoting *Fuentes*, 32 F.3d at 765).

At the summary judgment stage, the plaintiff-employee need not "'adduce evidence directly contradicting the [defendant-employer's] proffered legitimate explanations,'" but he may not strike down the defendant-employer's reasons without explanation. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804).  Plaintiff must allege specific "weaknesses implausibilities, inconsistencies, or contradictions, providing sound reasons for why a reasonable factfinder could find them unworthy of credence." *Fuentes*, 32 F.3d at 765.  Because the focus of this step of the analysis is "whether the employer acted with discriminatory animus," it is "not enough for a plaintiff to show that the employer's decision was wrong or mistaken." *Id.* (internal quotation marks and citations omitted).

Faillace argues that if Schwab had presented evidence on Drown's performance, that "Drown would have to show a discriminatory pretext – particularly a failure to provide a reasonable accommodation."  Faillace maintains that Drown's requested accommodation would have failed as a matter of law because it was unreasonable, impossible, and would have placed an undue burden on Schwab.  As previously discussed, those arguments have merit in the context of the second prong of a prima facie case under the NJLAD, as well as  in the context of the first prong of a prima facie case under the ADA.  *See Gaul v. Lucent Technologies Inc.,* 134 F.3d 576, 580 (3d Cir. 1998) ("A two-part test is used to determine whether someone is a qualified individual with a disability.  First,

a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. Second, the court must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." (internal quotations marks and citations omitted).  However, they are misplaced in regards to rebutting an inference of pretext.  Respectfully, those arguments do not refute Drown's burden at this stage of the *McDonnell Douglas* burden-shifting paradigm, which requires Drown to point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  Drown has met that burden, arguing that "the first and only written warning of alleged deficiencies in Drown's work performance was on the memo of July 26, 2004 (Defendants' Exhibit M), [which] is coincidentally the same date of Dr. Nadesan's Certification of Need for Reasonable Accommodation."  Based on that evidence, a reasonable jury could disbelieve that Schwab terminated Drown for his performance.

Therefore, this Court will now address Faillace's final argument – whether Drown can establish that Faillace's asserted legal malpractice proximately caused Drown damage because Drown's expert opinion constitutes a "net opinion."

## 2.    Is Drown's expert opinion a "net opinion?"

Expert testimony is required on the issue of proximate causation when the alleged malpractice is beyond the "common knowledge of lay persons."  *Froom v. Perel*, 377 N.J. Super. 298, 318 (N.J. App. Div. 2005) (internal quotation marks and citations omitted); *see also Sommers v. McKinney*, 287 N.J. Super. 1, 10 (N.J. App. Div. 1996).  However, "[t]he 'net opinion' rule

renders inadmissible any opinion consisting of bare conclusions that are unsupported by factual evidence." *Id.* (citing *Buckalew v. Grossbard*, 87 N.J. 512, 524 (N.J. 1981); *see also Nextel of N.Y., Inc., v. Borough of Englewood Cliffs Bd. of Adj.*, 361 N.J. Super. 22, 43 (N.J. App. Div. 2003) ("An expert opinion that is not factually supported is a net opinion or mere hypothesis to which no weight need be accorded." (citation omitted)); *Grzanka v. Pfeifer*, 301 N.J. Super. 563, 580 (N.J. App. Div. 1997) ("Under this doctrine, expert testimony is excluded if it is based merely on unfounded speculation and unquantified possibilities." (citation omitted)). Specifically, this rule "focuses upon the failure of the expert to explain a causal connection between the act or incident complained of and injury or damage allegedly resulting therefrom." *Kaplan v. Skoloff & Wolfe, P.C.*, 339 N.J. Super. 97, 102 (N.J. App. Div. 2001) (internal quotation marks and citations omitted). Therefore, for an expert opinion "[t]o be admissible as evidence, the expert's opinion must be based on standards accepted by the legal community and not merely on the expert's personal opinion." *Id.* Expert opinions will be stricken as net opinions "where they have failed to give the why and wherefore of their opinion, and have provided a mere conclusion." *Jimenez v. GNOC Corp.*, 286 N.J. Super. 533, 540 (N.J. App. Div. 1996).

Faillace argues that the expert report submitted by Drown's expert, Mr. Zatuchi, should be barred as a net opinion. First, Faillace contends that Mr. Zatuchni's conclusion – that Faillace's alleged negligence was the proximate cause of Drown's damages – is without foundation because the analysis lacks a consideration of whether (1) Drown could show "that his termination was not because of his numerous performance issues, but rather because of his accommodation request," and (2) "that his accommodation request was unreasonable as it imposed an undue hardship upon Schwab and otherwise unreasonable as a matter of law." Second, Faillace takes issue with Mr.

Zatuchni's conclusion of the potential settlement value of Drown's underlying employment claim against Schwab, alleging that Mr. Zatuchni fails to cite any cases that are "factually similar to Drown's reasonable accommodation request or a case involving defendant Charles Schwab or a comparable industry defendant" and that it is absent the supporting authority required by *Kaplan v. Skoloff & Wolfe, P.C.*

A review of Mr. Zatuchni's expert report reveals that Mr. Zatuchni has adequately explained and supported his conclusions with factual and legal support.  First, although Mr. Zatuchni did not expressly use the word "pretext," he nevertheless used factual support to explain why a reasonable jury could conclude that Schwab terminated Drown based on his request for an accommodation, rather than for his performance issues.  On page 23, Mr. Zatuchni states:

> Most compelling, rather than engaging in the interactive process to assist Drown, the evidence shows that Schwab immediately began targeting him for termination.  Schwab forwarded its first and only Performance Warning to Drown on July 29, 2004, only three days after receiving the Certification containing the request for accommodation.  (July 2009 Email and Performance Warning).  Then, without giving Drown any opportunity to correct his supposed deficiencies, Schwab terminated Drown only two or three days later.  Drown Dep. at 132.  In short, within approximately a week of his doctor requesting to Schwab that Drown be subjected to less workplace stress due to his medical condition, Drown was terminated.

Second, Mr. Zatuchni did not need to address the issue of whether the accommodation was reasonable, because he argues that Schwab failed to engage in the interactive process required to determine whether an accommodation is necessary for the employee.  He cites case law to explain that "[b]oth parties have a duty to assist in determining whether there are reasonable accommodation available" and that "both parties must act in good faith."  Because the parties have a duty to engage in determining whether a reasonable accommodation exists and he asserts that Schwab did not take

23

affirmative actions to determine whether such an accommodation existed, a discussion of whether the accommodation was reasonable would be placing the cart before the horse.

Finally, Mr. Zatuchni's discussion of a possible settlement agreement does not appear to be in conflict with *Kaplan*. Mr. Zatuchni states that he is basing his opinion not only on his fifteen years of hands on experience in litigation employment discrimination claims, but also on his knowledge of comparable verdicts in New Jersey. Mr. Zatuchni then lists five different disability discrimination cases, with varying jury verdicts. In *Kaplan*, the Appellate Division chided the expert for "fail[ing] to render a comparison of similar property agreements, other than one anecdotal reference to a case he had recently handled." The holding of *Kaplan* does not explicitly require that an expert rely on cases involving the same exact defendant or a comparable industry defendant. Further, Mr. Zatuchni explains that he used "the reasonable rule of thumb" that employment attorneys use in calculating damages for emotional distress – "project[ing] a number equal to the economic loss" – and that he discounted the amount for the "inherent risks of all litigation."

Accordingly, this Court finds that Faillace has not met his burden as the moving party of demonstrating that no genuine issue of material fact exists as to whether Drown could have established proximate cause on his underlying claim because they have not established that Mr. Zatuchni's report is a net opinion.

## IV.   CONCLUSION

Based on the foregoing, this Court concludes that Faillace's motion for summary judgment is denied.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

November 29, 2010